**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br>     Plaintiff, <br><br> v. <br><br> TOWN OF WOLCOTT, <br> CONNECTICUT, <br>     Defendant. | ) <br> ) <br> )   Civil Action No. <br> ) <br> )   **COMPLAINT** <br> ) <br> ) <br> ) <br> ) |

The United States of America, by its undersigned attorneys, files this Complaint and alleges:

## **INTRODUCTION**

1. The United States brings this civil action for declaratory and injunctive relief, monetary damages, and civil penalties against the Town of Wolcott, Connecticut (the "Town" or "Wolcott") under the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, as amended ("FHA"), 42 U.S.C. §§ 3601–3631. The Town has engaged in a pattern or practice of discrimination on the basis of disability, and denied rights to a group of persons, in violation of the FHA, by preventing the operation of community residences for adults with disabilities. The Town discriminated against providers seeking to open a group home for 13 adult residents with mental health disabilities by denying them a special use permit because of the residents' disabilities. The Town's denial also constituted a refusal to make a reasonable accommodation in violation of the FHA. Additionally, the Town violated the FHA by amending its zoning regulations to prohibit any community residence for adults with disabilities from operating in the Town.

1

## JURISDICTION AND VENUE

2. The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345; 42 U.S.C. § 3614(a), (b); and 28 U.S.C. §§ 2201 and 2202.

3. Venue is proper under 28 U.S.C. § 1391 because the events or omissions giving rise to the claims alleged herein occurred in this district and because the Defendant is located there.

## DEFENDANT

4. Defendant Town of Wolcott is a unit of local government organized under the laws of the State of Connecticut. The Town has the capacity to sue and be sued.

5. The Town is governed by a mayor and nine-member Town Council.

6. Land use in the Town is governed by the Town of Wolcott Zoning Regulations, adopted effective September 10, 1999 ("Zoning Regulations" or "Zoning Regs.").

7. The Town's Zoning Enforcement Officer is responsible for enforcing the Zoning Regulations and reviewing all zoning-related applications.

8. The Town's Planning and Zoning Commission ("Commission") is a five-member board that is responsible for the adoption of zoning and subdivision regulations, updating and revising land use regulations, and reviewing applications for special use permits, site plan applications, and applications for development.

## FACTUAL ALLEGATIONS

**The Town's Zoning Regulations**

9. The Zoning Regulations contain a "Schedule A" that lists the permitted uses in each of nine zoning districts. Zoning Reg. 23.1. Any use not specified in Schedule A is prohibited. *Id.* 23.2.

10. The Zoning Regulations provide that a "community residence" is a permitted use in all residential zoning districts subject to obtaining a special use permit from the Commission. Zoning Reg. 23.1, Schedule A, B-14.

11. Prior to May 2016, the Zoning Regulations defined a "community residence" as follows:

> A dwelling or part of a dwelling occupied by individuals who have a mental, physical or emotional disability, which contains no fewer than seven (7) but in no case more than 15 residents in any one dwelling who do not receive any special medical care or supervision, but are supervised by at least one staff person. A community residence shall be licensed under the provision of Sec. 19-574 or 17a-145 of the C.G.S.

Zoning Reg. 3.9. The Zoning Regulations do not define "special medical care or supervision."

12. The Zoning Regulations further provide that a special use permit to operate a community residence is a "right, vested in the premises, provided all of the aforesaid conditions are satisfied, and shall it be transferable." Zoning Reg. 32.2.6(f). The "aforesaid conditions" relate to lot and dwelling size, distance from nursing or convalescent homes or other community residences, licensing, and the "design and appearance" of the dwelling. *Id.* 32.2.6.

13. There is no other defined use in the Zoning Regulations that specifically addresses housing for persons with disabilities other than "community residence."

14. The Zoning Regulations define a "family" to include "a group of not more than five (5) persons who need not be [ ] related who are living together in a single dwelling unit and maintaining a common household."  Zoning Reg. 3.17.  The Regulations further provide, "A roomer, boarder or lodger to whom rooms are let and/or board is furnished shall not be considered a member of the 'family' and no roomer, boarder or lodger shall be permitted where the 'family' is defined as a group of unrelated persons."  *Id.*  The Zoning Regulations permit a "single detached dwelling for one (1) family" as of right in all residential zoning districts.  *Id.* 23.1, Schedule A, A-1.

15. The Zoning Regulations also permit "the letting of rooms and/or the furnishing of board in a dwelling unit to a total of not more than four (4) persons" as of right in all residential zoning districts.  Zoning Reg. 23.1, Schedule A, A-5.

**Applications for a Special Use Permit at 159 Old Bound Line Road**

16. 159 Old Bound Line Road is a property located in one of Wolcott's residential zoning districts.  It was built in 1992 and, from 1992 until 2015, operated as a community residence for eight teenage and adolescent females with emotional disabilities.

17. In 2015, 159 Old Bound Line Road was purchased by L&R Realty, Inc. ("L&R"), a Wolcott-based real estate developer.  L&R purchased and renovated 159 Old Bound Line Road for the purpose of leasing it to SELF, Inc. ("SELF").

18. SELF is a private non-profit group that operates community-based residential programs for individuals with mental health disabilities under contract with the State of Connecticut's Department of Mental Health and Addiction Services ("Department of Mental Health").  SELF intended to operate 159 Old Bound Line Road as a group home for 13 adult

clients with mental health disabilities. The disabilities of SELF's residents substantially limit one or more life activities.

19. 159 Old Bound Line Road does not appear outwardly different from other homes on the block. L&R did not build any additions to the home or otherwise expand its exterior footprint from its previous use. The house is well-maintained. It will not generate significantly more traffic or cars than other homes in the neighborhood. The home has adequate space for vehicle parking. The home is consistent with other land uses in the surrounding area.

20. Before purchasing 159 Old Bound Line Road, L&R consulted with the Town's Zoning Enforcement Officer to confirm whether the property could continue to be used as a group home. The Zoning Enforcement Officer assured L&R that there would be no problem using the property as a group home.

21. On September 21, 2015, L&R, joined by SELF, applied to the Commission for a special use permit to operate a community residence at 159 Old Bound Line Road. The Commission held a public hearing on the application on October 21, 2015.

22. Prior to and at the hearing, SELF submitted documents to the Commission that explained the program it intended to operate at 159 Old Bound Line Road, including that the program would house to up to 13 "geriatric" residents who have a psychiatric diagnosis, are referred by the Department of Mental Health, and receive disability benefits. SELF explained that its residents would be supervised 24 hours a day by staff at the home. Staff would also assist residents with activities of daily living to promote independence and community integration, including meal planning and preparation, housekeeping and laundry, budgeting, medication monitoring, referrals to other community services, scheduling and attending medical appointments, and assistance with employment searches. SELF's residents would attend daily

programming outside of the residence for six hours per day, through transportation provided by SELF.

23. The Department of Mental Health submitted a letter in support of SELF's proposed residence, explaining that SELF was under contract with the Department to provide residential support services for individuals who qualified for the Department's services and that it supported the rights of those individuals to live in the community. The Department of Mental Health stated that individuals with disabilities have broad rights and protections guaranteed to them under state and federal law, citing the FHA as well as other applicable laws.

24. At the October 21, 2015 public hearing on L&R and SELF's application, a number of community members spoke in opposition to the proposed residence. They expressed concerns related to the nature and severity of the disabilities of the residents that would live in the home and other concerns that reflected stereotypes about persons with disabilities, including concerns about neighbors' safety, supervision of the residents (including whether they would leave the property and get lost), and possible police disturbances.

25. Commission members raised similar concerns related to or reflecting stereotypes about the residents' disabilities, asking whether SELF's program would have sex offenders, whether the building would be "locked down" at night, whether there was an alarm system in case residents "escape," whether residents would wander or roam, whether residents were "dangerous" because of their disabilities, and about police calls to SELF's other residences. SELF assured the Commission that residents would have sufficient supervision, that residents' mobility impairments reduced the likelihood that they would be able to walk away from the home, that residents received screening before acceptance into SELF's program, and that SELF had no police disturbances at the other homes it operates.

26. The Commission voted to continue the public hearing to its November 4, 2015 meeting.

27. On October 30, 2015, L&R withdrew its initial application for a special use permit, both to resolve some fire system issues and also because it had been informed by a Town official that the Commission was going to deny the application if SELF did not have a state license for its program. As SELF had explained to the Commission, the Department of Mental Health, which contracts with SELF to provide services to individuals with mental health disabilities, does not issue licenses for its programs.

28. SELF subsequently obtained a license from the State Department of Public Health in an effort to satisfy the Town's concerns, and on March 31, 2016, L&R and SELF resubmitted the application for a special use permit along with that license.

**The Town's Amendment of the Zoning Regulations**

29. The Town interfered with and retaliated against L&R and SELF after they filed their initial application by amending the Zoning Regulations to prohibit community residences for adults with disabilities from operating in the Town.

30. After L&R and SELF withdrew their initial application for a special use permit, the Commission introduced a proposal to amend the definition of "community residence" in the Zoning Regulations. The Commission approved the amended definition on May 4, 2016, just over a month after L&R and SELF had resubmitted their application to operate a community residence.

31. The amendment made two changes to the definition of a community residence, which would effectively eliminate SELF's proposed use of 159 Old Bound Line Road as a

residence for adults with disabilities. Further, the amendments eliminated the possibility that any future "community residence" for adults with disabilities could operate in the Town.

32. First, the Commission reduced the number of individuals who may reside in a community residence. Pre-amendment, the Zoning Regulations permitted community residences housing up to 15 residents with disabilities. The amendment reduced the permitted number of residents to 4 to 7, which meant that SELF's proposed home for 13 residents would not be permissible under the amended definition for this reason alone.

33. Second, the Commission eliminated the reference to Connecticut General Statute ("C.G.S") 19-574 in the Zoning Regulations, which had the effect of allowing homes for children but not adults with disabilities. Pre-amendment, the Regulations provided that a community residence shall be licensed under C.G.S. Section 19-574 or 17a-145. Section 19-574 was a statute that referred to homes overseen by what was then called the Department of Mental Retardation, now the Department of Developmental Services, for persons with intellectual disabilities, without reference to their age. The statute no longer exists and was superseded by C.G.S. 17a-227, which currently governs the licensure of homes by the Department of Developmental Services. The other statute referenced in the Zoning Regulations, C.G.S. 17a-145, governs the licensure of boarding homes for children by the Department of Children and Families. By eliminating the reference to Section 19-574, leaving only a reference to 17a-145, and not including 17a-227, the amended definition of community residence applies only to homes for children.

34. The Town Attorney advised the Commission prior to their vote on the amendments that the amended definition would only allow facilities for children.

35. Thus, under the current Zoning Regulations, the only permissible housing in the Town for "individuals who have a mental, physical or emotional disability" is limited to a residence for four (4) to seven (7) children. Because uses that are not expressly permitted are prohibited, these restrictions potentially render the entire Town unavailable to adults with disabilities who require the supports and services of and seek to live in a group home in the community.

36. The Zoning Regulations continue to permit the following uses in residential zoning districts if a special use permit is obtained: (i) "child day care centers," defined as providing "a program of supplementary care to more than twelve (12) unrelated children outside their own homes on a regular basis for a part of the twenty four hours in one or more days of the week"; (ii) "elderly assisted and non-assisted housing," defined without restriction on the number of residents; (iii) "group day care homes," defined as private homes which provide "a program of supplementary care to not less than seven (7) nor more than twelve (12) related or unrelated children outside their own homes on a regular basis for a part of the twenty-four hours in one or more days of the week"; (iv) Town buildings and facilities; (v) non-profit places of worship, educational institutions, membership clubs, and community houses; and (vi) hospitals, convalescent homes, and nursing homes. Zoning Regs. 3.7, 3.16, 3.21, Schedule A.

37. The impact of community residences for adults with disabilities, including the group home that SELF proposed to operate at 159 Old Bound Line Road, on residential zoning districts would not be substantially different from, and in some cases would be less than, that of the other uses the Town permits in residential districts, including those referenced above in Paragraph 36.

38. While the proposed amendments were pending, and with knowledge that SELF and L&R were preparing to resubmit their application for a special use permit, the Town sought guidance from an outside attorney as to whether the amended definition could apply to an application that was filed prior to the amendment change. The Town was advised that it had to apply the regulations in place at the time an application was filed rather than apply the amended regulations retroactively. The amendments would apply to any future application by SELF to operate a community residence for adults with disabilities.

**The Commission's Denial of a Special Use Permit at 159 Old Bound Line Road**

39. On May 18, 2016, the Commission held a public hearing on L&R and SELF's resubmitted application for a special use permit to operate a community residence at 159 Old Bound Line Road.

40. At or just before the hearing, SELF and L&R learned that the Town might not accept the license SELF had obtained from the Department of Public Health and might instead require a license from the Department of Developmental Services under Section 17a-227, even though that statute was not referenced anywhere in the Zoning Regulations governing community residences.

41. Representatives for SELF and L&R addressed the licensing issue at the public hearing, explaining that the license that SELF had obtained was comparable or higher than a license from the Department of Developmental Services.

42. Again, there was substantial community opposition to the application at the public hearing. As they had done at the October 21, 2015 public hearing, community members expressed concerns about the nature of the proposed residents' disabilities and concerns about safety. They questioned whether residents would need to be restrained and whether they would

be "roaming" around the neighborhood.  They also raised concerns about parking, traffic, and emergency vehicles.

43.     Commission members echoed the public's concerns.  They asked whether residents were "aggressive," whether they would need restraint, and whether there would be "substance abusers" at the property.  These concerns reflect stereotypes based on persons with disabilities.

44.     Representatives from SELF and L&R explained at the hearing that there would be no sex offenders, substance abusers, or parolees at the residence; that the residence would be staffed by two staff members at night and between two to three staff members on daytime shifts; that there would be a monitoring and security system for residents; and that there would be more than adequate parking.  SELF representatives also explained that residents have mobility limitations that prevent them from wandering the streets; that they have not had any physical altercations or noise complaints involving their residents; and that an ambulance has come to their two other residences only four times total over the past year for medical issues.

45.     On June 1, 2016, the Commission voted to deny the application for a special use permit at 159 Old Bound Line Road.  The Commission gave the following reasons for its denial:

1. The proposed use does not meet the definition of "community residence" because the residents will receive "special medical care or supervision" and because the required license was not submitted.

2. Because the proposed use is not otherwise listed as a permitted use in Schedule A of the Zoning Regulations, it is therefore prohibited.

3. There is no vested right to a special use permit because failure to get the required license makes the prior special use null and void.

4. The proposed use does not comply with Zoning Regulation 31.12, which requires that the Commission consider the "public health, safety, and general welfare" because the increase in residents from 8 children to 13 adults "would

not be compatible and harmonious with the character of the surrounding neighborhood."

46.The Commission's finding that the proposed residents of SELF's home at 159 Old Bound Line Road would receive "special medical care or supervision" was based solely on the fact that SELF staff members would keep residents' medicine locked in a cabinet and distribute medicine to residents and that SELF had a nurse on site two to four hours per day who helped to coordinate residents' outside medical care and medication.  SELF representatives explained during public hearings that its residents would not need constant medical attention and supervision, that they attend doctors' appointments offsite, and that residents are capable of their own personal care.  There was no evidence presented that the home would contain any specialized medical equipment, that medical procedures would be performed there, or that there would be any doctors or other medical personnel onsite other than the visiting nurse.

47.The Commission cited no evidence in support of its finding that SELF's proposed group home "would not be compatible and harmonious with the character of the surrounding neighborhood," based on an increase in the number of residents to 13.  This finding is inconsistent with the definition of "community residence" applicable to the home at the time, which allowed for up to 15 residents, as well as with other comparable permitted uses in residential zoning districts that have no restrictions on the number of residents or visitors, including child day care facilities, convalescent and nursing homes, elderly living facilities, membership clubs, and educational institutions.

48.The Commission denied L&R and SELF's application without a legitimate interest to justify its decision.  Instead, the Commission denied the application because of the disabilities of the proposed residents and based on unfounded stereotypes against persons with disabilities.

49.     In denying the application for a special use permit at 159 Old Bound Line Road, the Commission acquiesced to community opposition to the use of the property as a residence for persons with mental health disabilities.  The Commission was aware that community members opposed SELF's proposed residence and that this opposition was based on the intended residents' disabilities.  Commission members' statements during public hearings reflect their own biases against the individuals with disabilities that were the proposed residents of 159 Old Bound Line Road.

**The Town's Failure to Grant a Reasonable Accommodation**

50.     At all times relevant to the Complaint, the Zoning Regulations and applicable Town policies did not specify any procedures for requesting a reasonable accommodation.

51.     SELF and L&R made a request for a reasonable accommodation when they submitted an application for a special use permit to operate a community residence at 159 Old Bound Line Road and submitted the license that SELF had obtained from the Department of Public Health.

52.     The Commission denied the application for a special use permit, and did so without addressing or considering whether or not to accept the Department of Public Health license in lieu of the outdated license provision referenced in the Zoning Regulations.

53.     Because of the Town's Zoning Regulations and zoning and land use practices, SELF has not opened a residence for adults with disabilities at 159 Old Bound Line Road and the property is currently vacant.

**SELF and L&R File Complaints with HUD**

54. On March 3, 2017, SELF and L&R timely filed a complaint with the Department of Housing and Urban Development ("HUD") pursuant to 42 U.S.C. § 3610(a), alleging that, through its actions, the Town discriminated based on disability in violation of the FHA.

55. On June 6, 2017, HUD referred SELF and L&R's complaint to the United States Department of Justice for appropriate action, pursuant to 42 U.S.C. § 3610(g)(2)(C).

56. The United States and Defendant have executed a series of agreements extending the applicable statute of limitations deadline for filing any cause of action under the Fair Housing Act. The current deadline is December 8, 2020.

## CLAIMS FOR RELIEF

### Violations of the Fair Housing Act

57. The allegations above are incorporated by reference.

58. The group home proposed by SELF and L&R at 159 Old Bound Line Road is a "dwelling" within the meaning of 42 U.S.C. § 3602(b). "Community residences," as defined in both the pre- and post-amendment versions of the Zoning Regulations are also "dwellings" within the meaning of 42 U.S.C. § 3602(b). The residents of these homes are persons with disabilities within the meaning of 42 U.S.C. § 3602(h).[1]

59. Defendant Town of Wolcott's actions described above constitute:

---

[1] Throughout this Complaint, the United States uses the term "disability" instead of "handicap." For purposes of the FHA, the terms have the same meaning. *See Helen L. v. DiDario*, 46 F.3d 325, 330 n.8 (3d Cir.) ("The change in nomenclature from 'handicap' to 'disability' reflects Congress' awareness that individuals with disabilities find the term 'handicapped' objectionable."), *cert. denied sub nom. Pa. Sec'y of Pub. Welfare v. Idell S.*, 516 U.S. 813 (1995).

a. discrimination in the sale or rental of, or otherwise making unavailable or denying, a dwelling because of disability, in violation of the FHA, 42 U.S.C. § 3604(f)(1);

b. a refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person an equal opportunity to use and enjoy a dwelling, in violation of the FHA, 42 U.S.C. § 3604(f)(3)(B); and

c. interference with and retaliation against a person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by the FHA, in violation of 42 U.S.C. § 3617.

60. Defendant has acted intentionally, willfully, and in disregard for the rights of others.

61. Defendant's actions constitute:

a. a denial of rights protected by the Fair Housing Act to a group of persons, which denial raises an issue of general public importance, under 42 U.S.C. § 3614(a);

b. a pattern or practice of resistance to the full enjoyment of rights granted by the Fair Housing Act, under 42 U.S.C. § 3614(a); and/or

c. a discriminatory housing practice, which the Secretary of HUD has referred to the Attorney General pursuant to 42 U.S.C. § 3610(g) and for which the Attorney General may seek relief, under 42 U.S.C. § 3614(b).

62.     SELF, L&R, the prospective residents of 159 Old Bound Line Road, and other persons and/or agencies who may have been the victims of Defendant's discriminatory conduct are "aggrieved persons" within the meaning of 42 U.S.C. §§ 3602(i) and 3614(d)(1)(B), and have suffered harm and damages as a result of Defendant's conduct.

## PRAYER FOR RELIEF

**WHEREFORE,** the United States prays that this Court enter an order:

    a.     Declaring that the Defendant's actions violate the Fair Housing Act;

    b.     Ordering the Defendant to take all affirmative steps to ensure their compliance with the Fair Housing Act, including steps necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate to the extent practicable the effects of their unlawful housing practices as described herein;

    c.     Ordering the Defendant to take all affirmative steps to restore, as nearly as practicable, the victims of the Defendant's unlawful practices to the position they would have been in but for the Defendant's discriminatory conduct;

    d.     Awarding monetary damages, pursuant to 42 U.S.C. § 3614(d)(1)(B), to all aggrieved persons; and

    e.     Assessing a civil penalty against the Defendant in an amount authorized by 42 U.S.C. § 3614(d)(1)(C) to vindicate the public interest.

The United States further prays for such additional relief as the interests of justice may require.

Dated  December 7, 2020

                                        Respectfully submitted,

                                        WILLIAM P. BARR
                                        Attorney General

JOHN H. DURHAM                   ERIC S. DREIBAND
United States Attorney               Assistant Attorney General
District of Connecticut              Civil Rights Division

                                        SAMEENA SHINA MAJEED
                                        Chief

 /s/ Ndidi N. Moses                     /s/ Katherine A. Raimondo
JOHN B. HUGHES (ct05289)         R. TAMAR HAGLER
Chief, Civil Division                 Deputy Chief
NDIDI N. MOSES (ct27456)          KATHERINE A. RAIMONDO (phv10469)
Assistant United States Attorney       Trial Attorney
United States Attorney's Office        United States Department of Justice
District of Connecticut              Housing and Civil Enforcement Section
157 Church Street, 25th Floor        Civil Rights Division
New Haven, CT 06437               4 Constitution Square
Phone: (203) 696-3000              150 M Street, NE
Ndidi.Moses@usdoj.gov             Washington, DC 20530
                                        Phone: (202) 305-1987
                                        Katherine.Raimondo@usdoj.gov